**Gregory E. MASON, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 04–C–60.**

United States District Court, E.D. Wisconsin.

July 12, 2004.

Ronald, B. Eskin, Lowell, MA, for Plaintiff.

Nora S. Barry, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Gregory Mason brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of defendant JoAnne Barnhart, Commissioner of the Social Security Administration, denying his application for benefits under the Social Security Act. Plaintiff alleged that he was unable to work due to depression and anxiety, but the Administration denied his claim. Plaintiff requested a hearing before an Administrative Law Judge (ALJ), but the ALJ also denied his claim. When the Appeals Council rejected plaintiff's re-

quest for review, the ALJ's decision became the final decision of the Commissioner. *Indoranto v. Barnhart,* 374 F.3d 470, 473 (7th Cir.2004).

Plaintiff argues that the ALJ's decision should be reversed and the matter remanded for an award of benefits or, in the alternative, for further proceedings. The Commissioner responds that the ALJ's decision is supported by substantial evidence and free of harmful legal error. The matter has been fully briefed and is ready for decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, he must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). He must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 & 416.920. The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). If not, the ALJ moves on to the second step, which is to determine whether the claimant has a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant has a severe impairment, the ALJ must determine at step three whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude SGA. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings"). If the claimant can demonstrate a listed impairment, he will be found disabled. *Lechner v. Barnhart,* 321 F.Supp.2d 1015, 1017 (E.D.Wis.2004).

The Listings of mental impairments consist of three sets of "criteria": the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. If a claimant satisfies the A and B, or A and C criteria, he will be considered disabled. *Wates v. Barnhart,* 274 F.Supp.2d 1024, 1036 (E.D.Wis.2003) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00); *see also* 20 C.F.R. § 404.1520a (discussing evaluation of mental impairments).

If the claimant's impairment does not meet or equal a Listed impairment, the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Lechner,* 321 F.Supp.2d at 1017. RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96–8p. The relevant mental work activities include understanding, remembering and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pres-

sures in a work setting. 20 C.F.R. § 404.1545(c).

At step four, the ALJ must determine whether, given his RFC, the claimant can perform his past work. If so, he is not disabled. If not, the ALJ must move on to step five and determine whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. *E.g., Samuel v. Barnhart,* 295 F.Supp.2d 926, 929 (E.D.Wis.2003).

■■■ The burden is on the claimant to present the requisite proof at steps one through four. However, if the claim proceeds to step five, the burden shifts to the Administration to establish that the claimant can engage in some other type of substantial gainful employment. The Administration may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the applicant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. *E.g., Samuel,* 295 F.Supp.2d at 929.

**B. Standard of Review of ALJ's Decision**

Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review "must be more than an uncritical rubber stamp." *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984).

■■■ Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

■■■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ commits such an error if he fails to comply with the Commis-

sioner's regulations and rulings. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991). The ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (1996)).

Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on or about April 20, 2001, alleging that he had been disabled since June 10, 2000 due to major depression and anxiety attacks. (Tr. at 40, 49.) He claimed that his illness rendered him unable to focus, that he lacked concentration, and that he was unable to make appropriate decisions. (Tr. at 49.)

Plaintiff's application was denied initially on November 27, 2001 based on the determination that plaintiff's conditions did not preclude low stress work. (Tr. at 26, 28–29.) Plaintiff requested reconsideration on January 22, 2002 (Tr. at 32) but his request was denied on August 8, 2002 (Tr. at 27, 34). On August 27, 2002, plaintiff requested a hearing (Tr. at 38), and on April 23, 2003, he appeared before ALJ Dale Garwal (Tr. at 275).

### B. Hearing Testimony

Plaintiff was the only witness at the hearing. He was represented by attorney Eileen Kinney. Plaintiff testified that he was 44 years old (Tr. at 280) and lived alone with two cats (Tr. at 301). He stated that his college major was business administration and that he had additional training in trademark administration from John Marshall Law School. (Tr. at 296.) Plaintiff testified that was employed as a trademark administrator for Abbott Laboratories from December 1989 to June 2000, which involved responsibility for Abbott's foreign trademark portfolio. (Tr. at 296.) He supervised one person—his secretary—until she died in May 1999. (Tr. at 297.) Plaintiff testified that this was a high pressure job, especially after his secretary died. (Tr. at 299.) From July 1986 to December 1989 plaintiff was employed as a trademark paralegal for Abbott. (Tr. at 298.) Plaintiff testified that he also worked part-time (12–15 hours/week) at Best Buy from November 1997 to June 2000. (Tr. at 297–98.)

Plaintiff stated that he had last worked on June 9, 2000. (Tr. at 280.) He indicated that in the last year of his employment he was often absent and often left early. He could not explain why—he just felt that he had to leave work. (Tr. at 281.) He testified that his employer became concerned about his absences and placed him on probation, which came as a shock to him because he always had a commendable work record. (Tr. at 281.) Abbott referred him to an employee assistance program, and the person he spoke to suggested that he seek psychiatric care. Plaintiff saw the psychiatrist, then began a leave

from work. June 9 was his last day. (Tr. at 282.) Since that time his only work was a brief stint as a bartender, which he was unable to handle because he became too flustered. (Tr. at 282–83.)

Plaintiff testified that he was unable to work because he had a hard time focusing and concentrating. At times, he was unable to even get out of bed. He stated that he could not go out for more than a short period of time. (Tr. at 283.) Plaintiff denied any physical problems impacting his ability to work. (Tr. at 284.)

Plaintiff testified that he felt depressed "pretty much all the time. Some days I can kind of put on a good face, maybe. But it's always underlying. And some days are just overwhelming." (Tr. at 300.) Plaintiff indicated that he had attempted suicide in February 2001. He stated that he began using cocaine with a roommate in January of 2001. (Tr. at 284.) He indicated that he was at the time extremely depressed and easily influenced. (Tr. at 284.) He stated that he felt better after he first tried cocaine. (Tr. at 284.)

> [But] then as we kept doing this, I was putting all this money on my credit cards. And it got to the point where there was no way I could ever dream of paying this stuff off. And I felt like I had just gotten myself into a corner or down a black hole that I could never get out of. And feeling as horrible as I did and as horrible as he did, we talked about a suicide pact. And I had stockpiled medication from my doctor, sleeping pills and anti anxiety pills. And we decided that we'd go out with a blast. A blast of cocaine, actually, you know, we had stuff to the last day and then I took the pills.

(Tr. at 284–85.) Plaintiff testified that he planned the suicide so that his mother, who was planning to visit, would find him. (Tr. at 285–86.) He stated that he had not used cocaine since the overdose in February 2001. (Tr. at 288.)

Plaintiff explained that on a normal day he would sleep late unless he had a doctor's appointment. He would listen to books on CD, which would occupy his mind. Then he would get up and make a sandwich or something for lunch. If he had laundry or chores to do around the house he would sometimes try to do that. (Tr. at 288–89.) Plaintiff indicated that he had a driver's license but that he only drove when he had to and when traffic was light. (Tr. at 280.) If he had shopping to do, he would go early in the afternoon when fewer people were on the roads. Then he would go to the library and get new books on CD. (Tr. at 288–89.) He testified that he went to the library about once a week, picking up enough books to last him a week or two. He testified that he kept a list of what he had listened to so that he would not have to spent a lot of time looking and could be in and out of the library in about 10 minutes. (Tr. at 289.) Plaintiff testified that if he had errands he would make a list of where he was going, but sometimes was unable to complete all of his tasks because he felt like he had to go home. (Tr. at 289.) He tried not to schedule too many things in a day because he became overwhelmed. (Tr. at 290.) Plaintiff testified that he watched television at night. (Tr. at 292.) Plaintiff stated that his mother helped him with housework, coming down for a week every month. (Tr. at 292.) He indicated that sometimes he would let things go and have 10 loads of laundry to do. (Tr. at 292.) He testified that he went to church occasionally, taking an elderly lady when he went. (Tr. at 294.) Sometimes, he had to leave early because he just felt that he had to leave. (Tr. at 295.) Plaintiff testified that he played the piano and the organ for a time, but no longer kept up with any hobbies. (Tr. at 295.) Once or twice per

week he was unable to get out of bed. (Tr. at 293.) Plaintiff stated that his source of income was long term disability from Abbot, administered by Kemper. (Tr. at 293.) He also received money from his 401K plan. (Tr. at 294.)

Petitioner testified that he had three friends he spent time with. They would get together every other week for dinner at one of their houses. (Tr. at 286.) Plaintiff testified that he went on a camping trip with his friends. (Tr. at 286.) He also testified that he helped with a benefit, but did not explain the details. (Tr. at 287.) Plaintiff further testified that he took a class through his church, which lasted for about an hour one night a week for three or four weeks, but he was unable to make all of the classes. (Tr. at 288.)

Plaintiff indicated that his psychiatrist was Dr. Baker, whom he had been seeing since April 1998, and his therapist was Diana Olson, whom he had been seeing since June or July of 2000. (Tr. at 290.) Plaintiff testified that he saw Dr. Baker monthly or every other month, and Ms. Olson every month. Dr. Baker had suggested that he see Olson more frequently. (Tr. at 291.) Plaintiff testified that he had been on several different medications during the time he had been seeing Dr. Baker. (Tr. at 291.) He indicated that he suffered some short-term memory problems as a side effect. (Tr. at 291.)

Plaintiff testified that he did not believe he could perform low stress work because he could not stay at the work place. (Tr. at 302.) He indicated that he sometimes had trouble sleeping but other times could sleep all day. (Tr. at 302.) He stated that he had trouble concentrating on projects around the house and generally taped television programs because he could not sit and watch the whole thing. (Tr. at 302.) He indicated that he occasionally had crying spells when he became overwhelmed. (Tr. at 303.) He stated that his personal hygiene was not what it used to be, although he tried to bathe every day. (Tr. at 303.)

## C. Medical Evidence

### 1. Treating Sources

#### a. Dr. Baker

Plaintiff began seeing Dr. Baker on or about April 10, 1998. (Tr. at 191.) Dr. Baker's notes are handwritten and very difficult to read. It appears that Dr. Baker prescribed Wellbutrin (Tr. at 188), Paxil (Tr. at 185) and Effexor (Tr. at 184), and saw plaintiff monthly or bi-monthly in 1998. It appears that plaintiff noted improvement in his condition during the early stages of treatment. (Tr. at 183–84.) However, plaintiff suffered an emotional setback when his secretary died in June 1999 and his dosage of Effexor was increased. (Tr. at 182.) On August 26, 1999, plaintiff reported feeling overwhelmed at work and that he had experienced an anxiety attack. However, he stated that his sleep was improved with an increased dosage of Trazodone. (Tr. at 181.) On October 7, plaintiff reported a lot of stress at work and home. He was prescribed Xanax. (Tr. at 180.) On December 9, plaintiff reported that he had been missing a lot of work and hated going there. His Xanax was continued. (Tr. at 180.) On January 6, 2000, plaintiff stated that he had been off work for the past three weeks, and on March 2 he brought forms for family leave. Xanax was continued. (Tr. at 179.) On March 29, plaintiff reported that he had been unable to get out of bed. On May 3, he reported that his family leave was about to expire and that he needed to re-apply. (Tr. at 178.) On June 1, plaintiff advised that he had been sent for an independent examination (ostensibly by Abbott) and the doctor had recommended two months off work. (Tr. at 177.) On July 5, plaintiff arrived with

his left arm in a sling following surgery on his elbow. (Tr. at 177.) He also reported that he had started seeing a therapist, Diana Olson. (Tr. at 177.) On July 31, plaintiff reported that it had been recommended that he take another month off. On August 31, he stated that he was still depressed. His dosage of Effexor was increased. (Tr. at 176.) On October 10, plaintiff reported that the increase did not change his condition, and it appears that the dosage was increased again. (Tr. at 175.) On November 14, plaintiff reported that his extended leave would be up that week and that he felt more depressed. He seemed "to be falling apart" and had "no energy." (Tr. at 174.)

On February 21, 2001, plaintiff was admitted to St. Mary's Medical Center following his suicidal cocaine overdose. (Tr. at 110.) He was then transferred to St. Luke's Hospital following a court hearing. (Tr. at 116, 120.) Plaintiff was evaluated by Dr. Arnold at St. Luke's and denied any suicidal ideation. He was clear and coherent, and stated that what he did was foolish. (Tr. at 120.) He related that he had been seeing Dr. Baker, but had not been taking his medication since he started using cocaine. (Tr. at 120, 130.) Dr. Arnold noted no evidence of psychotic content or process, and that judgment was intact. Dr. Arnold's diagnoses were dysthymia with secondary major depression and recent cocaine abuse. (Tr. at 120.) Dr. Arnold assessed a current GAF (Global Assessment of Functioning) of 50, with the highest GAF over the past year being 55 to 60.[1] (Tr. at 121.) Plaintiff was discharged on February 23 with the understanding that he would follow-up with Dr. Baker on February 26. (Tr. at 121.) His

family was to remove all medication and contraband from his residence. (Tr. at 135.)

On February 26, plaintiff reported to Dr. Baker that he had "hit rock bottom." (Tr. at 173.) Plaintiff related his suicide attempt of February 21. It appears that Dr. Baker prescribed several medications, which his family was "doling out," but the names cannot be discerned from the note. (Tr. at 173.) On February 28, plaintiff stated he could not believe he did that much cocaine. He indicated that all he wanted to do was sleep. (Tr. at 172.) On March 7, plaintiff reported that he was feeling better. (Tr. at 172.) But on March 26, plaintiff reported that he had no ambition and his medication was increased. (Tr. at 170.) On April 10, he reported feeling "bleak" with "no plans." (Tr. at 170.) On May 3, he related that he had received a summons for cocaine possession from when the rescue squad came to his home. (Tr. at 169.) He reported that he had been listening to a lot of books on tape. (Tr. at 169.) On June 9 plaintiff stated that he was doing OK most days. He stated that he wanted to return to work part-time. He reported that he was still sleeping a lot. (Tr. at 168.) However, on July 9 plaintiff reported that he was not doing well with decreased motivation and increased depression. (Tr. at 167, 171.)

The notes in the record then skip to January 9, 2002, when plaintiff reported that he was sleeping a lot and had low motivation. He stated that he had been denied social security and did not feel capable of working. (Tr. at 166.) On March 6, he guessed that he was "alright" but felt "tired a lot." (Tr. at 166.) On April 3, he

---

1. The GAF is a rating of a person's psychological, social and occupational functioning. Generally, scores above 70 reflect an individual who is functioning well; scores between 50 and 60 reflect an individual with moderate impairments, who may or may not be able to

work; and scores below 50 are reserved for those with severe psychological and occupational impairment. *Lechner,* 321 F.Supp.2d at 1022 n. 7 (citing Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)).

reported that he was about the same and wanted to sleep a lot. (Tr. at 166.) On August 7, plaintiff reported feeling overwhelmed. Dr. Baker spoke to him about adding Zoloft and continued him on Wellbutrin. (Tr. at 239.) On September 10, plaintiff reported feeling more depressed lately. (Tr. at 240.) On October 8, he stated that he felt better than last time. (Tr. at 241.) On December 3, plaintiff advised that he was "doing okay emotionally." (Tr. at 226.) However, plaintiff's affect was blunted. (Tr. at 226.) On February 4, 2003, plaintiff stated that he had a hard month—his 17 year old nephew had committed suicide. Nevertheless, he reported feeling a "little better." (Tr. at 226.) On April 8, plaintiff reported feeling "so so" and "anxious." (Tr. at 227.) His affect was still blunted. (Tr. at 227.)

Dr. Baker also completed several reports concerning plaintiff's condition. On October 3, 2001, Dr. Baker wrote a letter to Kemper, Abbott's long term disability insurance carrier. He indicated: "Gregory Mason has been under my care for three years. He is currently totally disabled because of his clinical condition, and will be disabled for at least 12 months." (Tr. at 229.) [2]

On October 3, 2001, Dr. Baker also completed a psychiatric questionnaire for the Administration. He indicated that he had been seeing plaintiff monthly since April 10, 1998. Plaintiff's diagnosis was major depression, recurrent. He stated that plaintiff's memory was impaired and that he was easily distracted. (Tr. at 140.) He further indicated that plaintiff got agitated and alternately suffered from insomnia and hyper-somnia. (Tr. at 141.) He stated that plaintiff was no longer interested in socializing or getting together with friends. (Tr. at 141.) He indicated that

plaintiff's ability to relate to others was sometimes OK, sometimes poor. (Tr. at 142.)

On July 10, 2002, Dr. Baker completed another questionnaire for the Administration. (Tr. at 194.) He again indicated that plaintiff's diagnosis was major depression, and that plaintiff had reduced concentration and short-term memory. (Tr. at 194.) He described plaintiff as experiencing decreased energy, weight gain and social isolation. (Tr. at 195.) He stated that plaintiff experienced increased anxiety when under pressure. He indicated that plaintiff used to work two jobs and engage in social activity but no longer. He also stated that plaintiff had a hard time completing projects. (Tr. at 195.) When asked about plaintiff's ability to understand, carry out and remember instructions, and respond appropriately to supervision, co-workers and routine work pressures, Dr. Baker wrote "unknown at this time." (Tr. at 196.)

On December 9, 2002, Dr. Baker completed a report concerning the applicability of the Listings. He found the presence of A criteria under Listing 12.04, Affective Disorders, namely anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, and difficulty concentrating or thinking. (Tr. at 233.) Under the B criteria, he concluded that plaintiff had "marked" restrictions of the activities of daily living; "marked" difficulties in maintaining social functioning; "moderate" deficiencies of concentration, persistence or pace; and one or two episodes of decompensation. (Tr. at 234.) Under the C criteria, Dr. Baker found the presence of repeated episodes of decompensation, a residual disease process that has resulted in

**2.** Dr. Baker also completed a form report for Kemper on, it appears, April 10, 2001. (Tr. at 258–59.)

such marginal adjustment that even a minimal increase in mental demands or change in environment would cause plaintiff to decompensate, and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of a continued need for such arrangement.[3] (Tr. at 235.) Dr. Baker indicated that there was insufficient evidence to evaluate plaintiff under Listing 12.06, Anxiety Related Disorders. (Tr. at 236.)

Dr. Baker also completed a Mental RFC assessment on December 9, 2002. He found that plaintiff was moderately or markedly limited in the categories of understanding and memory, sustained concentration or persistence, and adaptation. He found that plaintiff was moderately or markedly limited in four of the categories under social interaction, and not significantly limited in the fifth (ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness). (Tr. at 238.)

### b. Diana Olson

Plaintiff began seeing Diana Olson, M.S., for therapy on June 15, 2000. (Tr. at 274.) However, the earliest treatment note contained in the record is from April 17, 2001, when plaintiff discussed his suicide attempt. (Tr. at 269.) On May 3, plaintiff reported that his medication was not helping. He stated that he was not talking to people or doing much with anyone. (Tr. at 268.) On June 15, plaintiff was looking and feeling much better. He stated that he was looking forward to going back to work. However, he was still having a hard time getting out of the house. (Tr. at 268.) On July 5, plaintiff reported that he had not returned to work. He reported continued difficulty talking with people and avoided others as much as possible. (Tr. at 267.) On August 2, plaintiff advised

that his medication had been increased. He was sleeping a lot and feeling depressed. (Tr. at 266.) On September 6, plaintiff stated that he was getting out more and sleeping a little less and better at night. (Tr. at 265.) On October 5, plaintiff reported that a possible relationship had ended, and that he found himself sleeping more than he would like. (Tr. at 264.) On November 7, plaintiff stated that he was doing fairly well but felt very tired and slept a lot. (Tr. at 264.) On December 6, plaintiff reported that his social security application had been denied, and that he was feeling depressed and sleeping a lot. He reported having contact with several friends but that he tried to limit who and how many people he was with. (Tr. at 263.)

On January 3, 2002, plaintiff reported that he had a good Christmas with his family and a New Year's Eve party with friends at his house. (Tr. at 262.) On February 7, plaintiff indicated he was sleeping a great deal—most of the day—without any trouble sleeping at night. He reported feeling very unmotivated. (Tr. at 262.) On March 7, plaintiff reported that he was "doing OK" but still sleeping a lot. (Tr. at 261.) On April 4, plaintiff stated that he was not feeling well physically and wanted to sleep much of the time. He was still getting together with his dinner group every week. (Tr. at 260.) On May 2, plaintiff reported that his medication was working well and he was feeling much better. (Tr. at 257.) However, on June 6 plaintiff reported feeling depressed again. (Tr. at 257.) On July 11, plaintiff advised that his medication had been increased and he was doing pretty well. However, he reported having problems with short-term memory and needing to break down tasks into smaller parts. (Tr. at 257.) On September 12, plaintiff reported that he had

**3.** Thus, Dr. Baker concluded that plaintiff met Listing 12.04.

started on an increased dosage of Wellbutrin but did not feel any difference. He reported that he was going camping that weekend with friends. (Tr. at 256.) On October 9, plaintiff complained of forgetfulness, being easily distracted, poor concentration and low energy. He stated that he made himself notes and lists. He also stated that he avoided crowds as much as possible. (Tr. at 255.) On November 6, plaintiff reported that he had quit smoking and that he had been having strange dreams. (Tr. at 252.)

On January 31, 2003, plaintiff presented as very depressed, stating that he had gone to five funerals in the past month. He stated that his nephew committed suicide two weeks ago. He stated that he had not gone out in public since then. He stated that he could not have friends over or talk on the phone. (Tr. at 251.) On February 20, plaintiff reported feeling "out of sorts." (Tr. at 230.) He indicated that he had a panic attack at church the previous day because there were too many people. He indicated that he had been keeping in touch with friends, but his nephew's suicide was still weighing heavily. (Tr. at 230.) On April 11, plaintiff reported that he was forgetful about little things. His mood varied from day to day—sometimes he had a good day, then several down days. (Tr. at 230.)

Ms. Olson also completed several reports. On September 12, 2001, she completed a questionnaire for the Administration in which she indicated that she had been seeing plaintiff since June 15, 2000. (Tr. at 137.) She stated that she saw him in her office every two to three weeks and that he was very reliable. (Tr. at 137.) She wrote that his memory was fair, his concentration poor, and his attention varied with the depth of his depression. She stated that he generally presented as listless and apathetic, reported sleeping a great deal, and was reclusive. (Tr. at 137.) She stated that he presented to her as withdrawn but did cooperate during therapy. She wrote that because of his mental condition plaintiff had become very withdrawn, did not answer the phone, went out only when absolutely necessary, and showed little interest in staying in touch with friends. (Tr. at 138.) She stated that plaintiff had a long history of a great deal of pride in his work and work ethic. However, she opined that it "is doubtful he will be able to return to any type of work setting in the foreseeable future. At this time he becomes very agitated and anxious about leaving his home for most daily common activities such as grocery shopping or Dr. appointments." (Tr. at 139.)

On January 31, 2003, Ms. Olson completed a report concerning the applicability of the Listings. She found the presence of A criteria under Listing 12.04, Affective Disorders, and Listing 12.06, Anxiety Related Disorders. (Tr. at 245, 248.) Under the B criteria of Listings 12.04 and 12.06, she found "marked" restrictions of activities of daily living, "marked" difficulties in maintaining social functioning, "marked" deficiencies of concentration, persistence or pace, and "four or more" episodes of decompensation.[4] (Tr. at 246.) She wrote: "Client experiences extreme fluctuations of mood without necessary cause. He'll function at normal or high levels and without reason go into extreme depression." (Tr. at 246.) Ms. Olson also found the presence of two of the three C criteria under Listing 12.04 (Tr. at 247.)

Ms. Olson also completed a mental RFC assessment. She found that plaintiff was markedly or moderately limited in all categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. at 249–50.)

4. Thus, she also concluded that plaintiff met the Listings.

## 2. Consulting Sources

On November 5, 2001, Richard Fogle, Ed. D., completed an evaluation for the Administration after meeting with plaintiff. (Tr. at 143.) Dr. Fogle observed plaintiff to have good eye contact and be very cooperative. Plaintiff presented "himself very credibly and appear[ed] to be a reliable and truthful informant regarding his problems, his current demeanor, etc." (Tr. at 143.) Plaintiff indicated that he had applied for social security because of depression and anxiety. He stated that he was taking Xanax for anxiety, but the medication was discontinued after his overdose. He stated that he felt anxious around other people. However, he denied panic attacks. (Tr. at 144.)

Plaintiff described his daily activities much the same as at the hearing—sleeping about 12 out of 24 hours; listening to books on tape; driving infrequently; and trying to go to church, visit relatives, and spend time with friends. (Tr. at 146.) He indicated that his depression was improved somewhat since his overdose but he still felt quite depressed. (Tr. at 146.)

Dr. Fogle found plaintiff to be alert, adequately groomed and appropriately dressed. (Tr. at 147.) He was well-oriented, appropriately verbal and responded to questions logically and coherently. Dr. Fogle rated his rapport with plaintiff as excellent. Plaintiff's stream of mental activity was adequately spontaneous, with no acceleration of rate, distractability, or odd speech. (Tr. at 147.) Plaintiff's thought process was orderly and logical. His mood was moderately depressed. He appeared to be somewhat improved from former levels but still showed signs of mild to moderate degree of facial sadness, close to tearfulness. He appeared mildly apathetic. (Tr. at 148.) Dr. Fogle noted no major difficulties with respect to memory. (Tr. at 148.) Concentration appeared within normal limits. (Tr. at 148.) Insight appeared good. (Tr. at 149.)

Dr. Fogle's assessment was that plaintiff had

significant emotional components at this time, namely the depression, to a lesser degree perhaps the anxiety he experiences situationally. He continues to show some degree of improvement from former levels, plans to continue his therapeutic as well as psychiatric outpatient care.

DSM/DIAGNOSES:

| AXIS I: | 300.4 | Dysthymic disorder |
| | 305.60 | Rule out cocaine abuse (not current) |
| | 300.00 | Rule out anxiety disorder, not otherwise specified |
| | | |
| AXIS II: | V71.09 | No condition |
| | | |
| AXIS III: | Tendinitis (surgery) | |
| | | |
| AXIS IV: | Psychosocial stressors: limited income/unemployment/economic problems/former relation difficulties | |
| | | |
| AXIS V: | Current GAF: 50 | |
| | Highest GAF past year: 50 | |

(Tr. at 151.) Dr. Fogle opined that plaintiff had no significant problems with the ability to understand, remember and carry out instructions. Plaintiff had some mild difficulties in maintaining concentration, and motivation was a continued difficulty. His response to interaction with supervisors and co-workers was not deemed problematic. However, his ability to cope with stressors in everyday work routines or to adapt to change was rated as rather poor. Finally, plaintiff's emotional pattern suggested the need for continued psychiatric contact. "It appears that with continued progress as he has made in the last while, would eventually result in a return to his 'regular' mode of functioning." (Tr. at 151.)

On November 19, 2001, a state agency psychologist completed a Psychiatric Review Technique form for the Administration, evaluating plaintiff under Listings

12.04, 12.06 and 12.09. (Tr. at 207.) Under Listing 12.04. Affective Disorders, the reviewer noted the presence of dysthymic disorder. (Tr. at 210.) Under Listing 12.06, Anxiety–Related Disorders, the reviewer noted the diagnosis of rule out anxiety disorder, NOS. (Tr. at 212.) Finally, under Listing 12.09, Substance Addiction Disorders, the reviewer listed rule out cocaine abuse (not current). (Tr. at 215.) Under the B criteria applicable to these listings, the reviewer found "mild" restrictions of activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence and pace, and "one or two" episodes of decompensation. (Tr. at 217.) The reviewer did not find the presence of any C criteria under Listing 12.04 and 12.06. (Tr. at 218.)

On November 19, 2001, the same reviewer also completed a Mental RFC assessment for the Administration. (Tr. at 203.) S/he indicated that plaintiff was not significantly limited in any areas of understanding and memory, was not significantly or moderately limited in the areas of sustained concentration and persistence, was not significantly limited in social interaction, and was not significantly or moderately limited in the areas of adaptation. (Tr at 203–04.) The reviewer's conclusion was that:

> The claimant appears to have good attention, memory and concentration on mental status exam. Some difficult[y] with persistence and pace likely. Although at this time he has a tendency to avoid social interaction, he is capable of relating in a socially appropriate manner and maintaining good hygiene and grooming. Although the claimant may have moderate difficulty with tolerating the normal stress of the workplace and with responding to change, it appears the claimant should be capable of at least LSRW [low stress, repetitive work].

(Tr. at 205.)

On August 6, 2002, both reports were reviewed and approved by another state agency psychologist. (Tr. at 205, 207.)

**D. ALJ's Decision**

On June 19, 2003, the ALJ issued a decision denying plaintiff's application. (Tr. at 11–17.) The ALJ concluded that plaintiff suffered from severe impairments—major depression and anxiety disorder—but that neither met or equaled a listed impairment. (Tr. at 12–13.) The ALJ found that plaintiff had the ability to perform simple, unskilled, routine, repetitive, low stress work activity at any exertional level. (Tr. at 15.) Based on this RFC, plaintiff could not return to his past work. However, relying on Grid Rule 204.00, the ALJ concluded that other work existed in significant numbers in the national economy that plaintiff could perform. (Tr. at 16.)

**E. Appeals Council Review and District Court Action**

Plaintiff requested review by the Appeals Council (Tr. at 7) but on November 26, 2003, the Council declined his request (Tr. at 4). This action followed.

**III. DISCUSSION**

Plaintiff alleges that the ALJ committed three errors that require reversal. First, he argues that the ALJ improperly evaluated the medical evidence in formulating his RFC. Second, he argues that the ALJ improperly evaluated his testimony. Third, he contends that the ALJ erred in relying on the Grid at step five. He asks for an award of benefits or, in the alternative, a remand for further proceedings.

## A. RFC Determination/Evaluation of Medical Evidence

The ALJ found that plaintiff was capable of "simple, unskilled, routine, low stress work activity at any exertional level." (Tr. at 17.) Based on this RFC, the ALJ concluded that plaintiff could not return to his past work, but that other work existed in significant numbers in the national economy that plaintiff could perform. (Tr. at 17.)

Plaintiff points to two primary flaws in the ALJ's determination and the manner in which it was reached. First, he notes that the ALJ failed to mention several reports from treating source Dr. Baker. Second, he contends that the ALJ erred in basing his conclusions on (a) the alleged improvement in plaintiff's condition reflected in Dr. Baker and Ms. Olson's treatment notes and (b) the opinions of the state agency consultants who did paper reviews. In sum, he contends that the ALJ based his findings not on the medical evidence but on his own opinions, impermissibly "playing doctor."

### 1. Dr. Baker's Reports

Dr. Baker completed several reports regarding plaintiff's condition. However, the ALJ discussed only one of them, the one sentence letter Baker wrote to Kemper on October 3, 2001. (Tr. at 15.) The ALJ concluded that the October 3, 2001 letter was not entitled to controlling weight because (1) it was written in regard to a long term disability plan, which may have different standards than social security; (2) the report was written one and one-half years before the hearing on plaintiff's claim and might not reflect an accurate overall or longitudinal statement of plaintiff's condition; (3) Dr. Baker's treatment notes showed improvement from October 2001 to February 2003; and (4) the report contained a legal conclusion on an issue reserved to the Commissioner, i.e. whether or not the claimant is "disabled." (Tr. at 15.)

The ALJ ignored Dr. Baker's October 3, 2001 and July 10, 2002 questionnaires to the Administration and his December 9, 2002 reports on the applicability of the Listings and mental RFC. This was error. A treating source's opinion must be given "special consideration" in social security cases. *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, the ALJ must give such an opinion "controlling weight." *Id.* (citing SSR 96–8p). Even if he concludes that the report is not entitled to controlling weight, the ALJ must always "explain the consideration given to the treating source's opinion(s)." SSR 96–5p. The ALJ may never ignore such evidence. *Henderson v. Barnhart*, 205 F.Supp.2d 999, 1013 (E.D.Wis.2002) (reversing where ALJ failed to discuss treating source report).

Yet that is what the ALJ did here. The error is compounded by the bases the ALJ provided for his rejection of the October 3, 2001 letter. The ALJ stated that the letter pertained to a long term disability plan, not social security. However, Dr. Baker provided two questionnaires to the Administration—dated October 3, 2001 and July 10, 2002—as well as reports on the Listings and mental RFC dated December 9, 2002. These reports obviously pertained to plaintiff's eligibility for social security benefits. The ALJ also concluded that the October 3, 2001 letter did not provide an accurate longitudinal picture of plaintiff's condition. Had he considered them, the ALJ may have concluded that the later reports obviated that concern. Similarly, the ALJ may not have concluded that Dr. Baker's treatment notes depicted an improvement in plaintiff's condition

from 2001 to 2003 in light of the December 2002 reports which concluded that plaintiff met Listing 12.04 and had moderately or markedly limited mental RFC. Finally, unlike the one sentence letter to Kemper, which contained nothing more than a conclusion that plaintiff was disabled, the later reports contained much more detail and did not transgress on the Commissioner's authority on ultimate issues. *See* SSR 96–2p (stating that controlling weight must not be given to treating source opinions on issues reserved to the Commissioner, such as whether the claimant is disabled, meets a Listing, or is able to perform past work).

The Commissioner admits that the ALJ did not consider these reports but contends that they merely reiterated Dr. Baker's October 2001 conclusion that plaintiff was disabled. The argument lacks merit. As opposed to the October 3, 2001 letter to Kemper, which supplied only a bare conclusion on an issue reserved to the Commissioner, these reports provided additional details on plaintiff's condition, an evaluation under the Listings, and a detailed mental RFC assessment. Further, considering one report does not constitute an excuse for ignoring the others.

The Commissioner next argues that Dr. Baker's December 2002 assessment is virtually identical to Ms. Olson's January 2003 report, which the ALJ did discuss (and reject). I cannot assume that the ALJ would have similarly rejected Dr. Baker's report. First, "in reviewing the ALJ's decision I am limited to the reasons he supplied; I cannot consider the post hoc arguments of the Commissioner." *Alexander v. Barnhart*, 287 F.Supp.2d 944,

963 n. 21 (E.D.Wis.2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). Second, as the Commissioner later notes in her brief, Ms. Olson—a therapist—is not an "acceptable medical source" whose opinion is entitled to special consideration. *See* SSR 96–2p; 20 C.F.R. §§ 404.1502 & 404.1513(d)(1). It is undisputed that Dr. Baker was plaintiff's "treating source," 20 C.F.R. § 404.1502, whose report could receive controlling weight. Third, one of the reasons the ALJ gave for rejecting Ms. Olson's report was that her diagnosis differed from that of Dr. Baker. (*See* Tr. at 14.) Had the ALJ considered Dr. Baker's December 2002 reports he may have concluded that the difference was insignificant.

Finally, the Commissioner states that the ALJ properly focused on the treatment notes rather than the reports of the providers. However, the ALJ must consider *all* of the relevant evidence, not only that which supports his conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994) (collecting cases). Where the ALJ ignores important evidence in support of a claim the court must reverse. *See Godbey*, 238 F.3d at 807; *see also Green v. Shalala*, 51 F.3d 96, 101 (7th Cir.1995) (stating that ALJ is required to articulate "his analysis of the evidence" so that appellate court may "track the ALJ's reasoning and be assured that the ALJ considered the important evidence").

In sum, the ALJ committed an error of law in ignoring these reports. None of the Commissioner's arguments is sufficient to salvage the decision. Therefore, the matter must be reversed and remanded.[5]

---

5. Plaintiff also notes that although the ALJ discussed Dr. Fogle's opinion he failed to assign it any weight. This too was error. *See* SSR 96–6p ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."). On remand, the ALJ must re-evaluate this opinion.

## 2. Basis for ALJ's Conclusions

As noted, in reaching his RFC conclusion the ALJ relied primarily on two factors: (1) the alleged improvement in plaintiff's condition reflected in the treatment notes and (2) the state agency consultants' opinions. Both are problematic.

### a. Treatment Notes

Some of the treatment records do indeed reflect that plaintiff's condition was, at times, improved. (*See, e.g.,* Tr. at 226, 241, 257—May 2 note, 264.) However, it appears that just as often plaintiff reported feeling poorly. (*See, e.g.,* 166, 239, 240, 251, 256—June 6 note.) Indeed, Ms. Olson's notes from early 2003 reflect that plaintiff was not doing well. (Tr. at 230, 251.)

To be sure, it is the job of the ALJ and not the court to weigh conflicting medical evidence. Nevertheless, the ALJ's interpretation of the treatment notes in the present case—that plaintiff was improving—was at odds with the professional opinions of the treating physician and therapist, as expressed in their later reports. By finding that plaintiff met the requirements of Listing 12.04 and had markedly or moderately limited mental RFC in their December 2002 and January 2003 reports, Dr. Baker and Ms. Olson indicated that plaintiff's condition had not significantly improved since 2001. Moreover, courts have cautioned lay ALJs against interpreting medical data or records, *Worzalla v. Barnhart,* 311 F.Supp.2d 782, 796 (E.D.Wis.2004) (collecting cases), and have forbidden them from "playing doctor" and reaching their own medical conclusions. *See, e.g., Blakes v. Barnhart,* 331 F.3d 565, 570 (7th Cir.2003). By ignoring the expert opinions and reaching his own conclusion, that is essentially what the ALJ did in the present case.

### b. State Agency Consultants

██ The state agency consultants determined that plaintiff was capable of performing low stress, routine work activity. (Tr. at 15.) Despite acknowledging that these doctors had not examined plaintiff, the ALJ credited their opinions, finding them "consistent with the evidence of record." (Tr. 15–16.) This was error.

The Seventh Circuit has made clear that an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003). The ALJ failed to support his conclusion with the opinion of any examining source.[6]

Moreover, the ALJ's reliance on these reports—created in November 2001 and simply re-affirmed in August 2002—was inconsistent with his having rejected Dr. Baker's October 2001 report on the ground that it failed to account for the change in plaintiff's condition between October 2001 and early 2003. If plaintiff's condition changed the earlier conclusions of the state agency consultants would have been as suspect as Dr. Baker's. Because the ALJ's decision was "analytically inadequate" it cannot be upheld. *See Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir.1998).

In sum, the ALJ's analysis of the medical evidence was inadequate and contrary to the applicable regulations and rulings. The ALJ also failed to support his decision with substantial medical evidence. Therefore, the matter must be reversed and remanded.

---

**6.** As noted, while the ALJ discussed the report of examining consultant Dr. Fogle, he did not assign it any weight or rely on it to support his conclusions.

## B. Evaluation of Plaintiff's Testimony

The ALJ concluded that plaintiff's testimony "was not fully credible." (Tr. at 17.) The ALJ wrote:

While the claimant alleges that he sometimes cannot get out of bed due to depression, and cannot focus or concentrate, the objective evidence, as previously stated, does not support this. Moreover, the record confirms that the claimant performs his own self-care, drives daily, shops, listens to CDs, goes to the library once a week, cooks, attends church occasionally, cleans house, reads, performs yard work, cares for his cats, visits with family and friends weekly, visits with neighbors, does laundry, talks on the phone, watches TV, performs errands, takes an elderly person to church, sometimes plays the piano, owns his own home, lives alone, performs minor household repairs and pays bills. In addition, there is no evidence that the claimant experiences any side effects from his medications and he does not require any assistive devices.

(Tr. at 14–15, internal citation omitted.)

 Generally, the court must defer to the ALJ's credibility determination because he had the opportunity to personally observe the claimant's demeanor at the hearing. *Brown v. Barnhart,* 298 F.Supp.2d 773, 793 (E.D.Wis.2004). Thus, ordinarily, the court will reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir.2003). However, when the ALJ's credibility determination rests on objective factors rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision. *Wates,* 274 F.Supp.2d at 1038 (citing *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000)); *see also Herron,* 19 F.3d at 335 ("However, when such determinations rest on objective factors or fundamental im-

plausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision."). Further, the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence. *Wates,* 274 F.Supp.2d at 1038. Finally, the ALJ must comply with SSR 96–7p in evaluating credibility. *Lopez v. Barnhart,* 336 F.3d 535, 539–40 (7th Cir. 2003); *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir.2003).

SSR 96–7p provides, in pertinent part:

In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96–7p.

Under SSR 96–7p, the relevant considerations include:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally,

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p.

■ In the present case, the ALJ relied primarily on (1) the alleged improvement in plaintiff's condition reflected in the treatment notes and (2) a list of daily activities which he believed were inconsistent with plaintiff's testimony. As previously discussed, the treatment records reflect as many downturns as upswings in plaintiff's mood. Moreover, the ALJ's interpretation of the records was at odds with treating source statements. Therefore, the matter must be remanded for reconsideration of plaintiff's credibility in light of these reports.

The ALJ's list of plaintiff's daily activities also provides insufficient support for his conclusion. Some of the listed activities are not inconsistent with an inability to work, while others have little or no support in the record. I will address each activity in turn.

1. Plaintiff "performs his own self-care." The ability to care for one's self is not inconsistent with a finding of disability. *See. e.g., Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y.2000).

2. Plaintiff "drives daily." The evidence did not support this contention. In a pre-hearing submission plaintiff wrote that while he *used to* drive daily he now drove weekly. (Tr. at 69.) He also wrote that he had "increased anxiety while driving." (Tr. at 93.) When asked at the hearing whether he had trouble driving, plaintiff said that he drove only to familiar places and when traffic was light. (Tr. at 280.) This was consistent with his pre-hearing written submission. (Tr. at 93–94.)

3. Plaintiff "shops." Again, plaintiff indicated that he shopped "weekly" at a neighborhood store. (Tr. at 69, 91.)

4. Plaintiff "listens to CDs" and "watches TV." It is unclear how these activities could be indicative of an ability to engage in full-time work. Even in this "activity" plain-

tiff claimed that he was limited, stating that he usually watched programs on tape so that he could stop and start. (Tr. at 302.)

5. Plaintiff "goes to the library once a week." Again, it unclear how this is inconsistent with plaintiff's testimony. Moreover, plaintiff testified that he stocked up on enough books on tape to last him a week or two, and that he kept a list of what he had listened to so that he would not have to spent a lot of time looking and could be in and out quickly. (Tr. at 289.) This was entirely consistent with his testimony that he had difficulty leaving the house and interacting with the public.

6. Plaintiff "cooks." While plaintiff did indicate that he cooked for himself, he made "easy things." (Tr. at 91.) This is the sort of minimal activity which does not establish that a person is capable of SGA. *Clifford*, 227 F.3d at 872 (holding that plaintiff's ability to cook simple meals did not undermine her credibility); *see also Oslin v. Barnhart*, 69 Fed.Appx. 942, 948 (10th Cir.2003) (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir.1993)).

7. Plaintiff "attends church occasionally" and "takes an elderly person" with him. Plaintiff testified that he did not attend regularly and at times had to leave early due to anxiety, asking the elderly woman if she could find a ride home with someone else. (Tr. at 294–95.) Ms. Olson's treatment notes document a panic attack at church in February 2003. (Tr. at 230.)

8. Plaintiff "cleans house," "performs yard work," "does laundry," and "performs minor household repairs and pays bills." The evidence was that plaintiff tended to let things pile up and that his mother and sister came over to help him with household chores. (Tr. at 91, 292–93.) He specifically wrote that he never did yard work; "someone else does this for me." (Tr. at 69; *see also* Tr. at 94 ["I had to hire someone to do the yardwork. I have no energy and even less motivation to take care of these chores."].)

9. Plaintiff "reads." This is not the sort of activity that is inconsistent with an inability to perform SGA. *See Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir.2004) (citing *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir.2001)). Further, plaintiff consistently indicated that he preferred to listen to books on tape or CD. (Tr. at 146, 169, 289.)

10. Plaintiff visits with family, friends and neighbors. Plaintiff indicated that he would "infrequently get together with anyone." (Tr. at 92.) And, while plaintiff did testify that he had a small group of friends (Tr. at 286–87), obviously in a work situation plaintiff would be exposed to people beyond his small, comfortable circle. One can be disabled and yet get together with friends from time to time. *See Carradine*, 360 F.3d at 756. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir.1981).

11. Plaintiff "performs errands." Again, the record showed that plaintiff went out as little as possible.

12. Plaintiff "talks on the phone." Plaintiff wrote that he didn't "really like to talk on the phone. I do everything that I can to get off of the phone." (Tr. at 90–91.)

13. Plaintiff "sometimes plays the piano." The testimony was that plaintiff used to play the piano and organ but not anymore. (Tr. at 295.)

The ALJ also wrote that there was no evidence that plaintiff experienced side effects from his medications. In so doing he ignored plaintiff's testimony that he suffered some short-term memory problems as a side effect. (Tr. at 291.)

Thus, the daily activities upon which the ALJ relied were either unsupported by the evidence or were the sort of "minimal daily activities" that the Seventh Circuit has held do not necessarily contradict a claim of disability. *See Zurawski,* 245 F.3d at 887–88; *Clifford,* 227 F.3d at 871–72. Therefore, the ALJ's credibility determination must be reversed.

**C. Use of the Grid**

The ALJ denied plaintiff's claim at step five by relying on the Grid; there was no VE testimony.[7] Because plaintiff's limitations were purely non-exertional, while the Grid is predicated on the existence of strength limitations, plaintiff argues that this was error.

■■■ The Grid itself addresses this situation:

In the evaluation of disability where the individual has solely a nonexertional type of impairment, determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this appendix 2. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments.

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200(e). The Seventh Circuit has, consistent with this regulation, held that "where there is a nonexertional impairment the ALJ must go beyond the grid." *Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982) (citing *Cannon v. Harris,* 651 F.2d 513 (7th Cir.1981)); *see also Cooper v. Sullivan,* 880 F.2d 1152, 1155 (9th Cir.1989) (holding that where a claimant suffers solely from a nonexertional impairment the grids do not resolve the disability question and other testimony is required).

The Seventh Circuit has recognized an exception to the general rule, i.e. where the non-exertional limitation " 'has no significant impact on a claimant's capacity to perform the range of work the individual is otherwise exertionally capable of performing.' " *Pugh v. Bowen,* 870 F.2d 1271, 1277 n. 6 (7th Cir.1989) (quoting *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir. 1988)); *see also Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir.1986); *Zolek v. Apfel,* 123 F.Supp.2d 1136, 1141 (N.D.Ill. 2000).[8] However, the court has cautioned

---

7. The ALJ stated that he was using Rule 204.00 as a framework for decision-making, but it is undisputed in this court that the ALJ relied exclusively on the Grid in reaching his conclusion. In any event, as will be discussed, the ALJ cannot use the Grid as a framework (absent VE testimony) where nonexertional limitations significantly erode the claimant's possible range of work. *See Sykes v. Apfel,* 228 F.3d 259, 266 (3d Cir.2000).

8. The courts of appeals agree at a general level that the grids cannot automatically establish that there are jobs in the national economy when a claimant has severe exertional and nonexertional impairments." *Sykes v. Apfel,* 228 F.3d 259, 267 (3d Cir. 2000). However, some of the circuits, including the Seventh, "have held that the bar on exclusive reliance on the grids in this situation is limited by the requirement that the nonexertional impairment invoked must be significant enough to limit further the range of work permitted by the exertional limitations (the residual functional capacity) before it precludes application of the grids." *Id.* at 268 (citing *Warmoth v. Bowen,* 798 F.2d 1109, 1112 (7th Cir.1986)). As the court per-

that only in the clear case will the need for vocational testimony be obviated. As the court stated in *Warmoth:*

> [S]ome cases will be obvious in that the non-exertional limitation will have very little effect on, or will significantly erode, the range of work remaining than an individual can perform; in such cases, reference to the grid may be all that is necessary. In line with the regulations which provide for the grid's use as "a framework" in cases involving non-exertional impairments, see 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e)(2) (1985), the Secretary has instructed his personnel as follows:
>
>> A particular ... nonexertional limitation may have very little effect on the range of work remaining that an individual can perform. The person, therefore, comes very close to meeting a table rule which directs a conclusion of "Not disabled." On the other hand, a[ ] ... nonexertional limitation may substantially reduce a range of work to the extent that an individual is very close to meeting a table rule which directs a conclusion of "Disabled."
>
> Social Security Ruling 83–14 at 205 (CE 1983). But other cases (those falling between the two extremes) are more complex and generally will necessitate additional evidence to determine the effects of the non-exertional limitation on the job base. *Id.* While a vocational expert's specialized knowledge undoubt-

edly would be helpful in the present case, this is not to say that testimony from such an expert is required in this and every other case involving a non-exertional impairment, *see* 20 C.F.R. § 404.1566(e) (1985) (Secretary may use his discretion in employing the services of a vocational expert); rather, we only require that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available. *Nelson v. Secretary of Health and Human Services,* 770 F.2d at 684–85; *see also Clark v. Heckler,* 733 F.2d 65, 69 (8th Cir.1984) (per curiam); *Ferguson v. Schweiker,* 641 F.2d 243, 247–48 (5th Cir.1981). The record in the present case admits of none. We therefore conclude that the Secretary erred when he in effect summarily took administrative notice that there is a significant number of unskilled, sedentary jobs in the national economy that Warmoth can perform. *See Cummins v. Schweiker,* 670 F.2d 81, 84 (7th Cir.1982) (ALJ must determine "in a responsible manner" whether nonexertional impairments would interfere with type of jobs claimant can exertionally perform). It may be that Warmoth can still perform a significant number of jobs which exist in the national economy; however, the

---

suasively suggested in *Sykes,* this limitation on the general rule is problematic because, although the Grid establishes the availability of unskilled work in the national economy, it does so only in regard to claimants with exertional limitations. *Id.* at 268–70. "The regulations do not purport to establish jobs that exist in the national economy at the various functional levels when a claimant has a nonexertional impairment (or does not meet the criteria of the rule for other reasons)." *Id.* at 269. "Like the availability of jobs for claimants with exertional impairments, the

availability of jobs for claimants with exertional and nonexertional impairments may well be an issue that does not require case-by-case determination and may be fairly resolved through rulemaking. But the Social Security Administration has not promulgated regulations identifying jobs in the national economy for claimants with combined exertional and nonexertional limitations or identifying nonexertional impairments that are not significant enough to diminish a claimant's occupation base considering his exertional impairment alone." *Id.* at 270.

present record does not support that determination.

798 F.2d at 1112–13.

In the present case, the ALJ's decision does not provide "reliable evidence" that the limitations in question did not significantly diminish plaintiff's employment opportunities. As previously indicated, the ALJ relied primarily on the opinions of non-examining consultants, which are insufficient. *See Gudgel*, 345 F.3d at 470. The ALJ also ignored several treating source reports. Of particular significance was the ALJ's failure to discuss Dr. Baker's RFC assessment, in which Dr. Baker opined that plaintiff was moderately or markedly limited in all categories of understanding and memory, sustained concentration or persistence, and adaptation, and in all but one category of social interaction. (Tr. at 238.) As SSR 85–15 explains:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will

not offset such a severely limited occupational base.

Dr. Baker's report provided valuable information pertinent to this determination, but the ALJ failed to address it.[9]

The Commissioner defends the ALJ's reliance on the Grid, arguing that the ALJ's determination that plaintiff's non-exertional limitations did not significantly compromise his ability to work was supported by substantial evidence. As noted, the consultant's opinions are not substantial evidence, and the ALJ's other conclusions are compromised by his failure to address relevant evidence.

The Commissioner notes that the Grid takes administrative notice of the number of unskilled jobs available when the claimant's RFC, age, education and work experience coincide with a particular rule. Consistent with the requirements of unskilled work contained in SSR 85–15, the ALJ found that plaintiff could perform simple, unskilled, routine, repetitive, low stress work. However, this RFC determination cannot stand because it was based on insubstantial evidence and reached without consideration of treating source opinion.

Therefore, the ALJ's step five determination must be reversed.

## IV. CONCLUSION

For the reasons stated, the ALJ's decision must be reversed. Plaintiff requests remand for an award of benefits or, in the alternative, further proceedings. Generally, a judicial award of benefits is proper only when all essential factual issues have been resolved and the record clearly establishes that the plaintiff is entitled to benefits. *See. e.g., Faucher v. Sec'y of Health*

---

**9.** Also significant was Dr. Fogle's observation that plaintiff's ability to cope with stressors and to adapt to change in the workplace was poor. (Tr. at 151.) On remand, the ALJ must consider this evidence.

& *Human Servs.,* 17 F.3d 171, 176 (6th Cir.1994); *Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir.1993). In the present case, the record does not conclusively show that plaintiff is disabled. Further, the primary basis for reversal is the ALJ's failure to properly consider certain evidence. The appropriate remedy is a remand for further proceedings so that ALJ may properly adjudicate the application in the first instance.

**THEREFORE, IT IS ORDERED THAT** the Commissioner's decision is **REVERSED,** and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. On remand, the ALJ must evaluate and assign appropriate weight to all of Dr. Baker's reports and Dr. Fogle's report; re-evaluate the treatment notes in light of Drs. Baker and Fogle's reports; reconsider any reliance on the state agency consultants in light of the aforementioned; reconsider the credibility of plaintiff's testimony in light of Dr. Baker's reports and this decision; and consider whether VE testimony is necessary in light of this decision.