Carol A. SCHWABE, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.

No. 02–C–0487.

United States District Court, E.D. Wisconsin.

Sept. 25, 2004.

---

David Traver, for Plaintiff.

Nora Barry, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Carol Schwabe brought this 42 U.S.C. § 405(g) action against defendant Jo Anne Barnhart, Commissioner of the Social Security Administration, seeking judicial review of the Commissioner's decision denying her application for social security benefits. The matter was assigned to a magistrate judge for a report and recommendation, *see* 28 U.S.C. § 636(b), and on August 5, 2004, the magistrate recommended that the matter be remanded for further proceedings.

Both parties have objected. The Commissioner asks me to reject the recommendation and affirm the decision. Plaintiff agrees with the recommendation as far as it goes, but asks that I make additional findings on arguments the magistrate declined to address. The matter has been fully briefed and is ready for decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Review of Magistrate Judge's Recommendation

Where a party timely objects to a magistrate judge's recommendation, I conduct a de novo review of the objected-to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), and may review de novo any other aspects as I see fit, *see Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Based on the parties' objections, which together cover all of the issues raised in the case, it is appropriate to review the entire matter de novo.

### B. Review of Commissioner's Decision Denying Application

In social security cases, the district court's review is limited to determining whether the Commissioner's decision is supported by "substantial evidence" and based on the proper legal criteria. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004). The Commissioner's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir.2001). If the Commissioner commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

### C. Disability Standard

In order to obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has adopted a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). Under this test, the Commissioner must determine:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) If not, whether the claimant has a severe impairment;

(3) If so, whether the claimant's impairment(s) meets or equals one of the impairments listed in the SSA's reg-

ulations as being so severe as to preclude employment;

(4) If not, whether the claimant can perform her past relevant work;

(5) If not, whether the claimant can make the adjustment to other work.

*Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir.2004).

If the claimant makes the necessary showing at steps 1–3, she will be found disabled. If her impairment is not of such severity as to be presumptively disabling, the Commissioner must consider whether the claimant possesses the residual functional capacity ("RFC") to perform her past work. *Lechner v. Barnhart,* 321 F.Supp.2d 1015, 1018 (E.D.Wis.2004). If not, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *Young,* 362 F.3d at 1000. The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. The Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule or if nonexertional limitations such as pain, or mental, sensory or skin impairments might substantially reduce the claimant's range of work. In such a case, the Commissioner must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. *Worzalla v. Barnhart,* 311 F.Supp.2d 782, 787 (E.D.Wis.2004).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Applications and Administrative Decisions

Plaintiff first applied for benefits on October 26, 1994, alleging that she was unable to work due to a right shoulder injury. (Tr. at 57, 72). Her application was denied (Tr. at 60), so she requested a hearing before an Administrative Law Judge ("ALJ"). However, on September 13, 1996, ALJ John Pleuss issued a decision finding her not disabled. (Tr. at 39–50.) Plaintiff did not appeal.

On or about February 3, 1997, plaintiff filed another application, again based on her right shoulder injury (Tr. at 248–52), which was again denied. Plaintiff requested a hearing, but ALJ Michael Quayle ruled against her. (Tr. at 388–97.) In so ruling, ALJ Quayle relied upon the VE testimony taken before ALJ Pleuss, concluding that there were a substantial number of jobs plaintiff could perform. (Tr. at 394–95.)

Plaintiff requested review from the Appeals Council, which vacated ALJ Quayle's decision and remanded for another hearing. (Tr. at 401–03.) The Council directed the ALJ to obtain updated evidence from a VE to clarify the effect of plaintiff's limitations on her occupational base, obtain updated medical records from plaintiff's treating physicians, determine which portions of ALJ Pleuss's decision remained binding and which did not, and determine whether the doctrine of res judicata applied to the time period previously adjudicated. (Tr. at 402.)

Plaintiff appeared for a third hearing before ALJ Arthur Schneider on October 3, 2000. Plaintiff and VE Gregory Wisniewski were the only witnesses. Plaintiff was represented by counsel. (Tr. at 407.)

## B. October 3, 2000 Hearing Testimony

### 1. Plaintiff

Plaintiff testified that she was 54 years old, 5′2″ tall and weighed 160 pounds. She stated that her highest level of education was high school. (Tr. at 412.) She indicated that her last employment was as an order filler for Cotter and Company, a supplier for Tru Value Hardware. (Tr. at 413.) She indicated that the job involved retrieving items of up to 50 pounds and placing them in bins. (Tr. at 413.) Plaintiff testified that she held this job from 1982 to 1992, at which point she had to leave due to an injury to her right shoulder. (Tr. at 414.) She indicated that she underwent surgery, then physical therapy, and reached a healing plateau in May 1993. She was given permanent restrictions of no reaching beyond chest level and no lifting above 15 pounds. (Tr. at 414.)

Plaintiff testified that after her injury she was depressed, cried a lot, and her weight dropped to 89 pounds. She was prescribed anti-depressants but received no other mental health treatment. (Tr. at 415.) She testified that as the result of the medication her psychological problems cleared up. (Tr. at 422.)

Plaintiff indicated that after Cotter let her go she tried to find other work but that her restrictions prevented her from doing so. (Tr. at 416.) She sought help from the Wisconsin Division of Vocational Rehabilitation ("DVR"), which recommended that she try a home-based knitting business. However, plaintiff was unable to sell very much and found that she could not knit for very long because her arm became tired. (Tr. at 417–18.)

Plaintiff testified that her arm ached a lot of the time, more so when she exerted herself. (Tr. at 419.) She stated that she took over the counter medications for pain. (Tr. at 421.) She testified that her entire arm was weak and that she tended to drop things. (Tr. at 420.) She also stated that she developed pain in the left shoulder but did not see a doctor due to financial constraints. (Tr. at 420.)

Plaintiff testified that she occupied her time by knitting, watching TV and going to the grocery store. She stated that she was able to drive only short distances, and that she performed some housework with her left hand. (Tr. at 422.) She indicated that she could not even lift a gallon of milk with her right arm. (Tr. at 425.)

### 2. VE Testimony

The VE testified that plaintiff's past work as an order filler was medium, unskilled work. (Tr. at 428.) He stated that she had acquired no transferable skills from that employment. (Tr. at 429.)

The ALJ then posed a series of hypothetical questions. The first concerned a person of plaintiff's age, with her education and work experience, capable of lifting 20 pounds occasionally, 10 pounds frequently; sitting and standing six out of eight hours; and who could use the right arm only for balancing, with occasional use of the fingers for fine manipulation at waist level or below. (Tr, at 429.) The VE stated that such a person could not perform plaintiff's past work, but could perform other jobs such as information clerk, mail clerk, production tester and file clerk. (Tr. at 429–30.)

The ALJ's second hypothetical changed the lifting restriction to 15 pounds occasionally and 10 pounds frequently. In response, the VE stated that 25% of the file and mail clerk positions would be eliminated. (Tr. at 430.)

The ALJ's third hypothetical was the same as hypothetical one, except that the person could use the right arm to lift up to 15 pounds in stabilizing the left hand. The

VE opined that such a person could not perform plaintiff's past work but could perform other jobs such as inventory clerk, general office clerk and receptionist. (Tr. at 430–31.)

The ALJ's fourth hypothetical assumed a pain intensity that would require one absence from work per week. The VE stated that there was no work for such a person. (Tr. at 431.)

## C. Medical Evidence

The medical evidence admitted by ALJ Scheider showed that in March of 1992 plaintiff began experiencing problems with her right shoulder at work. On July 29, 1992, she was seen at the Sharon Medical Center, complaining of right shoulder pain for the past four months. She also complained of numbness and tingling in the right third and fourth digits, which caused difficulty picking up objects and combing her hair. (Tr. at 201.) The doctor's impression was that plaintiff had carpal tunnel syndrome, and she was scheduled for an EMG. (Tr. at 202.) Plaintiff returned on August 13 for the EMG, which was negative, but plaintiff was then experiencing a great deal of pain in the right shoulder. (Tr. at 203.) Plaintiff returned on August 20, experiencing continued pain in the right shoulder. (Tr. at 203.)

On August 21, 1992, plaintiff saw Dr. Kennith Miller, who wrote that plaintiff had experienced several months of progressively increasing pain and loss of motion of the right shoulder. He opined that plaintiff's work was a contributing factor and recommended that "she discontinue work and concentrate on therapeutic modalities to reduce her discomfort." (Tr. at 147.) His diagnosis was "[p]ainful shoulder arm syndrome." (Tr. at 147.)

On September 25, 1992, plaintiff saw Dr. Clarence Hart at Lakeside Orthopedics, complaining of pain with any overhead motion or internal rotation of the right shoulder. She also complained of episodes of numbness of the right hand. Dr. Hart took x-rays, which were normal. He suspected that plaintiff had "a frozen shoulder" and suggested that she undergo a right shoulder arthrogram to confirm. (Tr. at 161, 210.)

Plaintiff returned to Dr. Hart on October 4, 1992, complaining of night pain and trouble sleeping. The arthrogram showed a rotator cuff tear. Dr. Hart suggested surgery, and plaintiff agreed. (Tr. at 160, 211.) Plaintiff saw Dr. Hart for a pre-operative exam on October 8, and on October 9 she underwent acromioplasty and rotator cuff repair. (Tr. at 148; 208–09.)

Dr. Hart then started plaintiff on a physical therapy program to strengthen the shoulder, during which she again displayed symptoms of carpal tunnel syndrome. Dr. Hart therefore ordered EMG studies. (Tr. at 159.) By November 21, her shoulder was improved. However, the EMG had revealed carpal tunnel on the right, and Dr. Hart provided night splints. (Tr. at 156, 381.)

Plaintiff returned to Dr. Hart on December 17 and January 23, 1993, and her range of motion was improved. (Tr. at 155.) On February 13, 1993, Dr. Hart noted "quite good" range of motion but pain in the extremes. Plaintiff was "unable to do even over 3 lbs. of forces overhead without recurrence of her pain." (Tr. at 154.) Her carpal tunnel complaints were minimal and intermittent. Dr. Hart concluded that she had reached a healing plateau regarding her shoulder, and that the carpal tunnel problem was best left alone as it was not then troubling plaintiff. (Tr. at 154.)

On March 6, 1993, Dr. Hart wrote a report indicating that plaintiff had 25% permanent partial disability ("ppd") of the

right shoulder. He stated that "Mrs. Schwabe is totally disabled and unable to work at this time. It was suggested that she undergo a functional capacity evaluation so that a determination as to her future capabilities could be established." (Tr. at 153.)

On June 4, 1993, plaintiff saw Dr. Saul Haskell for a consultative examination. He wrote that plaintiff was able to return to work but with a limitation of

> no lifting over 15 lb items or lifting above chest level. Preferably, the patient should be able to use both arms for such lifting. Within the above limitations, she would be able to fill orders, et cetera, and additionally would be able to do any type of sedentary or desk work or other lifting and carrying providing it did not exceed the weight and range of motion restrictions above.

(Tr. at 150.)

On July 14, 1993, plaintiff returned to the Sharon Medical Center, reporting symptoms of crying, insomnia, and a desire to be alone. She advised that she had been on Xanax during a bought of depression three years previously, and she was provided with Xanax again, which was refilled on September 24, 1993 and January 27, 1994. (Tr. at 205.)

On July 30, 1993, plaintiff returned to Dr. Hart, who noted that she was not experiencing night time pain but continued to have reduced range of motion. He again opined that plaintiff had 25% ppd to the right shoulder. He stated that she could perform work in front of her, at tabletop level and below, but no overhead work. He stated that these restrictions were permanent and that he did not expect any further improvement. (Tr. at 152.)

On November 23, 1994, after the filing of her first application, plaintiff was examined by Dr. Robert Penn at the behest of the Administration. Dr. Penn noted that following initial improvement after her surgery plaintiff experienced worsening pain. On examination, he noted that she had limited range of motion and could not raise her right hand above her head. He opined that she would have difficulty doing any above-the-head work. (Tr. at 162–64.)

On December 9, 1994, Dr. Pat Chan completed an RFC assessment for the Administration, in which he indicated that plaintiff could perform light work but had reduced range of motion and pain in the right shoulder. (Tr. at 131.) On December 12, 1994, Jack Spear, Ph.D. completed a Psychiatric Review Technique form in which he indicated that plaintiff had no medically determinable mental impairment. (Tr. at 138.)

On March 6, 1995, Anthony Matkom, Ph.D., completed a Psychiatric Review Technique form for the Administration, in which he also indicated that plaintiff had no medically determinable mental impairment. (Tr. at 112.) On the same date, Dr. Kenneth Bussan completed an RFC assessment for the Administration, in which he concluded that plaintiff could generally perform light work (Tr. at 122) but had limited ability to reach with the right arm (Tr. at 124).

On September 25, 1996, plaintiff was seen by a physical therapist at Harvard Memorial Hospital. He found that plaintiff had 55% of the normal range of motion of the right shoulder, 70% right shoulder strength, and 33% grip strength with the right hand. (Tr. at 346.)

On March 26, 1997, after the second application for benefits was filed, Dr. Penn conducted another consultative examination for the Administration. (Tr. at 347.) He found that plaintiff had limited range of motion of the right shoulder, with palpable crepitance and tenderness. (Tr. at 348.) X-rays revealed mild acromioclavi-

cular joint degenerative changes, evidence of previous surgery, and nothing acute. (Tr. at 349.)

On May 2, 1997, Dr. Callear completed an RFC assessment for the Administration, concluding that plaintiff could perform medium work but was limited in the ability to reach overhead. (Tr. at 351–53.) Dr. John McDermott concurred. (Tr. at 364–67.)

On May 13, 1997, plaintiff returned to Lakeside Orthopedics and was seen by Dr. James Knavel. Plaintiff complained of pain in the right shoulder, left shoulder and neck, and tingling in her left hand. (Tr. at 363.) On examination, Dr. Knavel found that plaintiff essentially had full range of motion of the neck and left shoulder. X-rays of the shoulders revealed narrowing of the subacromial space on the right. He concluded that Dr. Hart's assessment and final determination of July 30, 1993 regarding the right shoulder should not be altered. Dr. Knavel's impression was that plaintiff had impingement syndrome on the left. He further concluded that she probably had carpal tunnel on the left side and sent her for an EMG to rule this out. (Tr. at 363.)

On May 15, 1997, plaintiff saw Dr. Raymond Rybicki on referral from Dr. Knavel. Dr. Rybicki performed an EMG, which was normal. (Tr. at 362.) Plaintiff returned to Dr. Knavel on May 22, 1997, complaining of episodes of paralysis of the right arm. Dr. Knavel referred her back to Dr. Rybicki (Tr. at 359), who saw her on June 5, 1997 (Tr. at 360). Plaintiff explained that she had experienced several episodes of right arm paralysis lasting for 10–15 minutes. She also complained of difficulty concentrating and remembering things. (Tr. at 360.) Dr. Rybicki was

unable, through testing, to determine any cause for the episodes of paralysis. He offered an additional battery of tests, but plaintiff deferred. (Tr. at 361.)

Plaintiff returned to Dr. Knavel on June 10, 1997, and indicated that she was planning to start her own business. Her shoulder felt better with exercises. (Tr. at 359.)

### D. Vocational Evidence

Plaintiff received vocational assistance and evaluation from various sources. In September 1993, she began working with the Disability Management Network (DMN).[1] (Tr. at 316.) At the initial meeting with the counselor on September 23, plaintiff expressed a desire to obtain employment and "move along with her life." (Tr. at 316.) Plaintiff related that she enjoyed knitting and indicated that she would like to operate a craft store with her daughter. (Tr. at 318.) The counselor indicated that plaintiff was restricted to lifting of 15 pounds and no lifting above chest level. She was also taking Xanax and reported feeling uncomfortable going out of her home and being with people. (Tr. at 319.) The counselor suggested contacting local gift stores for job opportunities, as well as exploring bench work positions at chest level. (Tr. at 320.)

On November 12, 1993, the DMN counselor reported that an employment opportunity had been located for plaintiff at Miniature Precision Components (MPC). Plaintiff reported being very excited about the possibility. (Tr. at 321.) However, it appears that the position at MPC fell through when no work could be located consistent with plaintiff's restrictions. In all, DMN developed 87 prospective job

---

**1.** DMN was retained by plaintiff's employer's workers compensation insurance carrier to assist her in finding other work. (Tr. at 333.)

leads, 15 qualified job leads, and secured three interviews, but plaintiff obtained no job offers. (Tr. at 333.)

Plaintiff's workers compensation lawyer then hired Ronald Gehrig, MS, CRC, to prepare a vocational assessment. In a January 31, 1994 report, Gehrig stated: "Competitive employment for Mrs. Schwabe would be extremely hard to secure. The types of positions that she may qualify for would be that such as cashier/checker, cashier/clerk, file clerk or receptionist.... It would be likely that she would only be able to perform this type of employment on a part-time basis." (Tr. at 84.)

In March of 1994, plaintiff began working with the Wisconsin DVR in an effort to return to work. (Tr. at 176.) As part of the DVR evaluation process, plaintiff's counselor, Angela Hastings, referred plaintiff to Henry Lenard, Ed. D., who performed various tests, including the Wechsler Adult Intelligence Scale, which revealed a full scale IQ of 84. (Tr. at 169.) Academic testing revealed that plaintiff read at a ninth grade level, spelled at a sixth grade level and performed arithmetic at a seventh grade level. Dr. Lenard indicated that plaintiff was operating "within the low-average range of intelligence." (Tr. at 170.) He also concluded that she was in the "borderline range in regard to memory facilities." (Tr. at 170.)

Dr. Lenard stated that plaintiff "in all probability presented with a modest depression prior to her right shoulder injury [and that] the major disability of the rotator cuff problem of the right shoulder has exacerbated the depression[.]" (Tr. at 170–71.) Dr. Lenard opined that plaintiff was "basically ill equipped in regard to any future vocational endeavor outside of a homebound type of program since she has for all intents and purposes very little transferability of skill to other work func-

tions." (Tr. at 171.) However, plaintiff did show interest in arts and crafts, and Dr. Lenard suggested that homebound activity of this type might be the best option. (Tr. at 171.)

In a June 20, 1994 letter, Hastings stated: "It is my professional opinion that Ms. Schwabe is virtually unemployable in a production setting within our job market.... I am, however, not certain that she could not find part-time employment in a retail setting." (Tr. at 168.) Hastings stated that the next step would "be to assess her ability to operate either a home based enterprise in the craft area or to further research employment in the retail setting." (Tr. at 168.)

Hastings prepared a letter report dated September 28, 2000, to be presented in lieu of her live testimony at plaintiff's hearing before ALJ Schneider, which detailed her efforts to find plaintiff employment. (Tr. at 332) In the letter, Hastings stated that plaintiff began working with DVR's home based enterprise instructor in April 1995, developing a plan to knit crafts in the home. However, the knitting proved to be physically difficult for plaintiff, and she was unable to master a knitting machine. Thus, the plan was determined not to be feasible. (Tr. at 334.) By August 1998, "it was apparent that [plaintiff] was unable to affect any type of return to work, within or outside the home." (Tr. at 335.) Hastings concluded that it was her professional opinion that plaintiff was unemployable. (Tr. at 335.) She stated: "I attribute this to the combined factors of physical, emotional, and intellectual deficiencies. Taken as individual diagnoses [plaintiff's] limitations may not appear to be totally disabling, combined they are just that." (Tr. at 335.)

## E. ALJ's Decision

ALJ Schneider issued an unfavorable decision on January 26, 2001. Following

the five step sequential process, the ALJ concluded that (1) plaintiff was not currently employed; (2) she had a severe impairment of the right shoulder, but that her carpal tunnel syndrome and mental problems were not severe; (3) her shoulder impairment did not meet or equal a listed impairment; (4) plaintiff had the RFC for light work, with use of the right arm "for balancing with only occasional use of the right hand to perform fine finger manipulation at or below waist level" (Tr. at 27), and based on that RFC could not perform her past work; and (5) relying on the VE's response to the first hypothetical question, there were other jobs plaintiff could perform. Therefore, he "affirmed" the previous decision denying her application and found her not disabled. (Tr. at 20–30.)

## F. Appeals Council Review and District Court Action

Plaintiff requested review by the Appeals Council (Tr. at 10), but the Council denied her request (Tr. at 7), making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. *See Flener v. Barnhart,* 361 F.3d 442, 446 (7th Cir.2004).

Plaintiff then commenced the instant action under § 405(g). Before the magistrate, she argued that the ALJ committed five errors requiring reversal: (1) he improperly evaluated her credibility; (2) he failed to determine whether plaintiff could make the vocational adjustment to other work given her age, education and work history; (3) he failed to consider vocational evidence contrary to his position; (4) he improperly evaluated plaintiff's alleged mental impairment; and (5) his holding regarding res judicata was not supported by substantial evidence. (R. 6.) The Com-

missioner responded that the ALJ's decision was supported by substantial evidence and free of harmful legal error. (R. 8.)

The magistrate concluded that the ALJ's RFC determination—that plaintiff could perform the lifting requirements of light work (i.e. 20 pounds occasionally, 10 pounds frequently) [2]—was not supported by substantial evidence. He noted that the treating and examining physicians had limited plaintiff to lifting of 15 pounds, with no lifting above chest level. The only contrary medical evidence came from the state agency reviewers, who concluded that plaintiff could perform medium work (i.e., lift 50 pounds occasionally and 25 pounds frequently).[3] Thus, the magistrate concluded that the ALJ's finding regarding plaintiff's ability to lift was unsupported by the medical record. Further, the magistrate found that the ALJ had failed to explain why he had deviated from the treating physicians' limitations in setting RFC. Therefore, the magistrate recommended that the matter be remanded for re-evaluation. He stated that plaintiff's remaining arguments could be addressed by the ALJ on remand. (R. 15.)

The Commissioner objects to the recommendation, arguing that the ALJ's RFC finding was not materially inconsistent with the opinions of plaintiff's treating physicians. Even if the distinction between lifting 20 pounds and 15 pounds was meaningful, the ALJ asked the VE a hypothetical including the 15 pound limitation, and the VE opined that the person could still perform a substantial number of jobs. Thus, the Commissioner argues, remand on this point would serve no useful purpose. Plaintiff partially objects, asking me to make additional findings regarding the issues the magistrate did not reach.

---

**2.** *See* 20 C.F.R. § 404.1567(b).

**3.** *See* 20 C.F.R. § 404.1567(c).

## III. DISCUSSION

### A. RFC Determination

 The ALJ concluded that plaintiff retained the RFC for light work, i.e. lifting and carrying 20 pounds occasionally and 10 pounds frequently and sitting/standing six out of eight hours, with the added restrictions of (1) use of the right arm only for balancing and (2) only occasional use of the right hand to perform fine finger manipulation at or below waist level. (Tr. at 27.) It is unclear from his decision what medical evidence the ALJ relied upon to make this determination. While the ALJ need not adopt and rely solely on a single medical report in determining RFC, his decision must " 'include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts.' " *Samuel v. Barnhart*, 316 F.Supp.2d 768, 772 (E.D.Wis.2004) (quoting SSR 96–8p).

None of the treating or examining physicians imposed restrictions consistent with the ALJ's RFC finding. For example, examining physician Dr. Haskell imposed a lifting restriction of 15 pounds, with no lifting above chest level. (Tr. at 150.) Treating physician Dr. Hart stated that plaintiff was unable to exert even three pounds of force overhead without recurrence of pain. (Tr. at 154.) He assessed plaintiff with 25% ppd at the shoulder and stated that she could perform no overhead work. (Tr. at 152.) Examining physician Dr. Penn concurred with Dr. Hart's limitation on overhead work (Tr. at 163), as did treating physician Dr. Knavel (Tr. at 363).

 The only medical reports mentioned by the ALJ that allowed for lifting above 15 pounds were the RFC assessments completed by state agency reviewers Drs. Callear and McDermott, who both opined that plaintiff was capable of medium work (though both doctors did limit plaintiff's ability to reach overhead).[4] (Tr. at 26, 351, 364.) But the ALJ did not specifically rely on those reports. Nor did he provide any other explanation for his conclusion that plaintiff could lift 20 pounds, contrary to Dr. Haskell's specific finding that she could lift only 15. Neither did he explain why his RFC assessment failed to include the limitation of no overhead work imposed by Drs. Hart, Penn and Knavel, all of whom were examining and/or treating physicians. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003); *see also* SSR 96–8p ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). In the present case, the ALJ failed to cite substantial evidence supporting his decision and failed to comply with SSR 96–8p. Thus, his decision must be reversed. *See Prince v. Sullivan*, 933 F.2d 598, 602–03 (7th Cir.1991) (holding that ALJs must comply with SSRs).

The Commissioner argues that the ALJ did, in fact, find that plaintiff "could use her right arm only for balancing, and that

---

**4.** The record contains RFC assessments from Drs. Chan and Bussan indicating that plaintiff could perform light work. (Tr. at 122, 131.) However, because the ALJ did not cite these reports they cannot provide support for the Commissioner's position. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.2002) ("[R]e-

gardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ.").

she could only use her right arm 'at or below waist level,'" (R. 16 at 2, quoting Tr. at 27), consistent with the doctors' opinions. That is not quite what the ALJ said. The ALJ did limit plaintiff's use of her right arm to balancing, but the second limitation was on "use of the right hand to perform fine finger manipulation at or below waist level." (Tr. at 27.) This is not the same as "no overhead work." The ALJ never made clear—at the hearing (Tr. at 429–31) or in his decision—exactly what he meant by "balancing." Nor did he explain the significance of limiting fine finger manipulation to waist level but no other work to that level.

The Commissioner also contends that the difference between 20 pounds and 15 pounds is insignificant. Not necessarily. In fact, according to the Grid, such differences can be critical for a person like plaintiff. Grid rule 202.13, which the ALJ used as a "framework" for his decision (Tr. at 27), holds that a person capable of light work, who is "closely approaching advanced age," [5] with a high school education and unskilled work experience, is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.13. However, Grid rule 201.12 holds that the same person, if limited to sedentary work [6] and lacking the education to directly enter into skilled work, *is* disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.12.

Section 201.00(g) of the Grid explains the significance of the difference between light and sedentary work for people like plaintiff:

Individuals approaching advanced age (age 50–54) may be significantly limited in vocational ability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disability ordinarily obtains. However, recently completed education which provides for direct entry into sedentary work will preclude such a finding. For this age group, even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education.

20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(g).

Dr. Haskell's 15 pound lifting limitation falls between light and sedentary. However, Haskell also specifically stated in his letter report that plaintiff could perform "sedentary" work. (Tr. at 150.) Dr. Hart's reports also suggest that plaintiff is limited to sedentary work. No treating or examining physician opined that plaintiff could perform light work, and, as noted, the ALJ failed to explain why he ruled to the contrary.

In any event, where a claimant's RFC is properly determined to fall between exertional categories, the ALJ must follow SSR 83–12 at step five. The Ruling states, in pertinent part:

If the exertional level falls between two rules which direct opposite conclusions, i.e., "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:

a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a suffi-

---

**5.** A person aged 50–54 is "closely approaching advanced age." 20 C.F.R. § 404.1563(d).

**6.** "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).

cient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."

b. On the other hand, if the exertional capacity is significantly reduced in terms of the regularity definition, it could indicate little more than the occupational base for the lower rule and could justify [a] finding of "Disabled."

c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, [VE] assistance is advisable for these types of cases.

SSR 83–12.

■ In the present case, the ALJ did consult a VE, who opined on the number of jobs available within the RFC set forth in the ALJ's hypothetical questions. And, as the Commissioner notes, the ALJ did include, in his second hypothetical, a lifting restriction of 15 pounds. (Tr. at 430.) The Commissioner argues that because the VE testified in response to that question that there were still a significant number of available jobs, remand would serve no useful purpose. The argument seems to be that even if the ALJ erred in relying on the first hypothetical, which assumed a

capacity for light work, the error was harmless. *See Keys v. Barnhart,* 347 F.3d 990, 994–95 (7th Cir.2003) (holding that harmless error doctrine applies to § 405(g) review). However, because the second hypothetical question failed to include other limitations supported by the medical evidence, I cannot agree.

■ It is well-established that if "the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir.2004) (citing *Young,* 362 F.3d at 1003; *Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir. 2003); *Steele,* 290 F.3d at 942). In the present case, the ALJ failed to properly account, in any of his hypothetical questions, for the limitation on plaintiff's ability to perform overhead work. SSR 83–12 makes clear that significant loss of the use of an upper extremity is a critical factor the VE must take into account in determining the size of the remaining occupational base.[7] Because the ALJ's questions did not require the VE to do so here, the VE's responses cannot be considered substantial evidence supporting the ALJ's step five determination. *See Young,* 362 F.3d at 1005 ("When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence

---

7. SSR 83–12 discusses two "special situations" that may result in substantial erosion of the occupational base—(1) where the claimant must alternate sitting and standing, and (2) where the claimant has loss of the use of an upper extremity. *See Boone v. Barnhart,* 353 F.3d 203, 209–11 (3d Cir.2003) (finding that ALJ erred in finding plaintiff, whose RFC fell between light and sedentary, not disabled because she required a sit/stand option). Under the second situation, the SSR discusses not just complete loss of the use of the arm (e.g. paralysis or amputation) but also "partial loss of use of the extremity." SSR 83–12. In the present case, there is evidence that plaintiff experienced episodes of paralysis (Tr. at 360), but more importantly, the undisputed medical evidence shows that plaintiff's loss of the use of her right arm was substantial. The ALJ did not properly account for such loss.

in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand."); *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir.2002) ("Because the ALJ based his finding, at step five of the evaluation process, that Burns could perform a significant number of jobs in the national economy on this deficient hypothetical question, we find that it was not based on substantial evidence."); *Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir.2001) ("Because the hypothetical question posed to the vocational expert was based on this incorrect RFC, the expert's response cannot constitute substantial evidence to support a conclusion that Holmstrom is not disabled.").

Therefore, for all of these reasons, I conclude that the ALJ's RFC determination violated SSR 96–8p and SSR 83–12, and that the record does not contain substantial evidence supporting the ALJ's step five determination.

## B. Credibility Determination

■ Regarding plaintiff's credibility, the ALJ wrote:

When [plaintiff's] complaints and allegations concerning the impairment and limitations are considered in light of all objective medical evidence, as well as the record as a whole, they do not show that she was so severely impaired by pain and other discomfort that she was incapable of engaging in all substantial gainful activity[.]

(Tr. at 26.)

There are two problems with the ALJ's credibility determination.

### 1. The ALJ Made No Explicit Credibility Determination

■ While the ALJ's conclusion as to the claimant's credibility must be afforded great deference by a reviewing court, the manner in which he reaches that conclusion is highly regulated. *Lechner*, 321 F.Supp.2d at 1027. For example, SSR 96–7p provides that:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p. The Seventh Circuit has said much the same. *See, e.g., Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("The cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony.").

In the present case, while the ALJ cited 20 C.F.R. § 404.1529 and SSR 96–7p and discussed some of the relevant factors thereunder in the body of his decision (e.g.

daily activities, use of pain medication),[8] he never linked that discussion to his determination that plaintiff's testimony failed to support her claim of disability. Because I cannot infer a credibility determination from a general discussion of the evidence, *Lechner*, 321 F.Supp.2d at 1029, this was error, *see, e.g., Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir.2003) (holding that when an ALJ rejects a claimant's testimony and denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion); *Golembiewski*, 322 F.3d at 915–16 (rejecting Commissioner's argument that discussion of evidence in the body of the ALJ's decision implicitly supplied reasons for rejecting plaintiff's testimony, and stating that "nothing in Social Security Ruling 96–7p suggests that the reasons for a credibility finding may be implied"); *Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) (reversing where decision lacked explanation allowing the court to understand the weight given to the claimant's statements or the reasons for that consideration as required by SSR 96–7p); *Steele*, 290 F.3d at 942 ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.").

## 2. The Evidence Discussed by the ALJ Failed to Support his Implied Conclusion

Even if it would be proper for me to infer a credibility determination from the ALJ's discussion of the evidence, the evidence cited does not support his implied conclusion that plaintiff was not credible.

First, the ALJ noted that plaintiff

displayed a marked disparity in the range of motion testing of the right shoulder to Dr. Penn in comparison to all the other examinations reported by other physicians. That was a consultative examination arranged solely for the evaluation of [plaintiff's] impairment for purposes of this claim, and she performed more poorly on range of motion testing [than] she did at the other examinations of her shoulder.

(Tr. at 25.)

Plaintiff was examined by Dr. Penn twice—in November 1994 and in March 1997. The ALJ did not indicate to which examination he was referring in the above-quoted passage. However, because the ALJ only mentioned the November 1994 visit in the body of his decision (Tr. at 23), presumably, he was referring to it in his credibility discussion. At the November 23, 1994 examination, it is true that plaintiff was "able to abduct only to 30 degrees." (Tr. at 163.) In July 1993, Dr. Hart found that plaintiff could abduct to "90 degrees with some discomfort." (Tr. at 152.) This is a disparity. However, the ALJ failed to mention that plaintiff's abduction was essentially consistent during her examinations by both treating and consultative physicians in 1997 (including the exam by Dr. Penn), when she filed the application at issue. (*See* Tr. at 348, 363.) Moreover, Dr. Penn did not—in either of

---

8. SSR 96–7p sets forth seven relevant considerations in evaluating a claimant's complaints of pain: 1)the claimant's daily activities; 2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

his reports—opine that plaintiff was exaggerating her symptoms.

Second, the ALJ stated that a vocational counselor "reported that the claimant was highly motivated and eager to return to work until the report dated January 10, 1994." (Tr. at 25.) The ALJ then implied that plaintiff's motivation vanished when she learned that " 'the types of employment that she could now secure certainly would be a good deal less advantageous monetarily than she had experienced.' " (Tr. at 25, quoting Ex. 7.)

The ALJ took these comments out of context and misunderstood what they meant. In her June 10, 1994 letter, DVR counselor Hastings did state: "Reports of [DMN] indicate that Ms. Schwabe was highly motivated and eager to find work until the last report dated 1–10–94." (Tr. at 167.) However, it is clear that Hastings was not saying that plaintiff's motivation ended on January 10, 1994; rather, she was saying that DMN stopped working with plaintiff on January 10, 1994. None of the DMN reports in the record question plaintiff's motivation.[9] Plaintiff consulted with vocational counselor Gehrig in late January 1994, and he described her as "open and cooperative" and noted that she wanted to return to her prior employment. (Tr. at 81.) Despite Gehrig's opinion that DVR retraining was likely not an option, and that "[c]ompetitive employment for Mrs. Schwabe would be extremely hard to secure" (Tr. at 84), plaintiff proceeded to work with DVR for several years in order to obtain employment (Tr. at 166–76, 332–35). Plaintiff attempted to start a home-based craft business but did not succeed. (Tr. at 167, 334.) Hastings stated that, despite their efforts, by August 1998 "it was apparent that Mrs. Schwabe was unable to affect any type of return to work, within or outside the home." (Tr. at 335.) The record simply does not support the ALJ's supposition that plaintiff basically gave up on work in January 1994. Thus, to the extent that the ALJ construed the statements quoted as casting doubt on plaintiff's motivation and credibility, his conclusion was " 'patently wrong.' " *Barnett v. Barnhart,* 381 F.3d 664, 670 (7th Cir.2004) (quoting *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir.2003)); *see also Mason v. Barnhart,* 325 F.Supp.2d 885, 902 (E.D.Wis.2004) (stating that "the court need not defer to a credibility determination based on a misunderstanding or one-sided view of the evidence.").

Third, the ALJ noted plaintiff's testimony that

> her right arm only functions for a short period of time because of pain and weakness. She claimed that she is unable to use it for routine activities such as opening a can or lifting a gallon of milk. However, [plaintiff] also reported that she cooked every day, straightened her home, vacuumed, did shopping, did laundry, and fixed things around her home. Moreover, she was using that arm to do knitting and other craft work. (Exhibits 6, 8, 9, and 20)

(Tr. at 25.)

The exhibits cited by the ALJ do not support his implied conclusion that plaintiff's daily activities were inconsistent with her testimony. In exhibit 6, a disability report, plaintiff wrote: "My right arm only does stuff for short periods of time before it starts to hurt and gets weak. I cannot open a can or lift a gallon of milk. Everything I do takes a lot more time to do

---

9. The record contains DMN reports dated 9/23/93, 11/12/93 and 12/7/93. (Tr. at 316–25.) The January 10, 1994 report is missing. However, the reports of vocational counselors Gehrig and Hastings confirm that DMN stopped working with plaintiff in January 1995. (Tr. at 84, 333.)

because my arm starts to hurt and I have to stop and rest it." (Tr. at 72.) Later in the report, she wrote that she cooked every day, but "[o]ther maintenance I do about once a month because it is hard for me to do and causes my arm to hurt when I do it." (Tr. at 75.) She wrote that she knitted every day but "with many rest periods while doing it." (Tr. at 75.)

In exhibit 8, a daily activities questionnaire, plaintiff wrote: "My arm only works for very short periods of time before it gives me pain or doesn't work at all." (Tr. at 87.) In describing a typical day, she wrote: "I get up between 5 & 6 and have coffee. Then I pick up the house mostly using my left arm. Watch talk shows and do some knitting until my arm starts to hurt. Fix supper and go to bed." (Tr. at 88.) She stated that these activities took "about 3 or 4 hours," which was "a lot longer than" before her injury. (Tr. at 88.) She wrote that she prepared meals, but "[s]ometimes I need help from my daughter or husband." (Tr. at 88.) She stated that she prepared "can[ned] and frozen foods because stirring really hurts my arm." (Tr. at 88.) Regarding shopping, she wrote: "My husband and I do food shopping once a month at Cubs Foods. My husband has to push the cart and unload it because my [arm?] won't do that." (Tr. at 88.) Regarding household chores, she wrote: "I vacuum once a month, do laundry once a week and cook everyday." (Tr. at 88.) She further stated: "I can no longer pick up [my grandchildren] or play any of the games we used to play because I need both arms to do them." (Tr. at 89.) Exhibit 9, an activities questionnaire filled out by plaintiff's daughter, largely corroborated plaintiff's written submissions. (Tr. at 101.) Finally, exhibit 20, the DVR file compiled by Hastings, indicated that plaintiff had an interest in knitting. (Tr. at 166–78.) However, Hastings's later report (which the ALJ failed to discuss)[10] confirmed that production hand knitting was too hard for plaintiff. (Tr. at 334.)

It is clear that the foregoing exhibits do not support the ALJ's conclusion that plaintiff's daily activities exceeded her stated capacity. Rather, her reduced activities appeared to be consistent with her claim of disability. *See, e.g., Mason,* 325 F.Supp.2d at 903–05 (rejecting credibility determination based on limited daily activities, and collecting cases).

▆▆▆ Fourth, the ALJ noted that there was a "long break in [plaintiff's] medical treatment," and that by November 1994 she was no longer using anti-inflammatory medication. (Tr. at 25.) If the ALJ drew a negative inference from this observation, it was a clear violation of SSR 96–7p, which provides in pertinent part:

> The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

SSR 96–7p; *see also Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1097 (E.D.Wis.2001) ("Even assuming that the evidence warranted the ALJ's conclusion

---

**10.** I will address this issue later in the opinion.

that plaintiff's doctor visits were intermittent or infrequent, the ALJ should not have drawn an adverse inference with respect to her credibility without making additional inquiry."). In the present case, the reasons for the gap in plaintiff's treatment were plainly stated in the record: after plaintiff recovered from her shoulder surgery, no further treatment was considered "appropriate or necessary." (Tr. at 152.) And plaintiff testified that she lacked the funds to continue seeing doctors regarding her pain. (Tr. at 420.) The ALJ failed to consider these explanations.[11]

Fifth, the ALJ stated that when plaintiff "again consulted a physician in May 1997, Dr. Knavel stated that she was primarily there because her disability claim had been turned down." But that was Knavel's observation (and a gratuitous one at that).[12] So far as the record shows, plaintiff did not tell Dr. Knavel that. The record indicates that plaintiff complained to Dr. Knavel that she was experiencing pain in both shoulders and her neck, and tingling in her hand. On examination, plaintiff had "positive Phalen's sign," an indicator of carpal tunnel syndrome. (Tr. at 363.) Dr. Knavel referred plaintiff to a neurologist, who performed some tests that came back normal. (Tr. at 362.) The neurologist, Dr. Rybicki, suggested additional tests (Tr. at 361), which the ALJ faulted plaintiff for declining (Tr. at 26). However, Dr. Knavel concurred with plaintiff's decision to forego expensive additional testing. (Tr. at 359.) Thus, there is little support for the ALJ's conclusion from this evidence. In any event, as noted, an ALJ

cannot hold lack of treatment against a claimant without following the procedure prescribed by SSR 96–7p. *See also Herron v. Shalala,* 19 F.3d 329, 336 (7th Cir. 1994) ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits.").

In sum, none of the reasons implicitly supplied by the ALJ support his credibility determination. Therefore, the decision must be reversed for this reason as well.

## C. The ALJ Did Not Consider Vocational Evidence Contrary to his Decision

In his decision, the ALJ briefly mentioned the 1994 report of DVR counselor Hastings. (Tr. at 25.) However, at no point did he mention her detailed September 28, 2000 report, which she submitted in lieu of live testimony. (Tr. at 332.) While the ALJ need not provide a written evaluation of every piece of evidence, *Pugh v. Bowen,* 870 F.2d 1271, 1278 (7th Cir. 1989), he may not entirely ignore important evidence that suggests an opposite conclusion, *Taylor v. Schweiker,* 739 F.2d 1240, 1243 (7th Cir.1984); *see also Anderson v. Bowen,* 868 F.2d 921, 924 (7th Cir.1989).

In her September 2000 report, Hastings set forth in detail the efforts made to find employment for plaintiff. Those efforts failed, and Hastings concluded that plaintiff was unemployable in light of the "combined factors of physical, emotional, and intellectual deficiencies." (Tr. at 335.) By

11. The ALJ also noted that when she saw a physical therapist in 1996, plaintiff reported that her pain was a "three" on a scale of one to ten. (Tr. at 25.) The ALJ selectively read the report. Plaintiff said that her pain was rated three out of ten "at rest" but eight out of ten "with activity." (Tr. at 346.) "An ALJ

may not select and discuss only that evidence that favors his ultimate conclusion[.]" *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir.1995).

12. The medical note reads: "This patient is here primarily I think because she was rejected in her application for SSI." (Tr. at 363.)

failing to consider this important evidence, the ALJ erred. *See, e.g., Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir.2000) (reversing where ALJ failed to consider vocational evidence contrary to his conclusion); *Power v. Heckler,* 614 F.Supp. 336, 338 (D.Me. 1985) (vacating decision where ALJ ignored vocational expert opinion based on extensive vocational evaluation report); *Green v. Schweiker,* 582 F.Supp. 786, 789–90 (D.Kan.1984) (reversing where ALJ ignored report of vocational rehabilitation counselor); *cf. Flores v. Shalala,* 49 F.3d 562, 570–71 (9th Cir.1995) (holding that ALJ's failure to consider an important vocational report established that the Commissioner's position was not substantially justified).

## D. Evaluation of Plaintiff's Mental Impairment

■ ALJ Schneider concluded that the evidence was insufficient to establish a severe mental impairment. He noted that plaintiff had previously taken medication for depression but had stopped using it by the time her claim reached the hearing stage. He further noted that Dr. Lenard had stated that plaintiff appeared to be depressed, but that Lenard recommended no further treatment or evaluation; no treating physician subsequently recommended mental health treatment either. ALJ Schneider acknowledged that ALJ Pleuss, who decided plaintiff's first claim in 1996, had found a severe mental impairment. However, ALJ Schneider noted that when plaintiff saw Dr. Rybicki in 1997 her immediate, recent and remote memory were intact, and that plaintiff displayed adequate memory at the hearing before him. Therefore, he found no severe mental impairment. (Tr. at 23–24.)

Plaintiff argues that the ALJ did not properly consider Dr. Lenard's diagnoses of an adjustment disorder and a processing learning disability. She further contends that the ALJ impermissibly "played doctor" by commenting on her recollection at the hearing and interpreting the results of Dr. Lenard's testing. I cannot conclude that the ALJ erred in this regard.

First, ALJ Schneider acknowledged Dr. Lenard's diagnoses. However, as the ALJ noted, Dr. Lenard recommended no treatment or additional mental evaluation. Rather, Dr. Lenard recommended that plaintiff be evaluated by a specialist to determine whether there was a physical cause for her severe weight loss. Moreover, Dr. Lenard did not suggest any restriction on plaintiff's ability to work based on her mental status, and plaintiff cites no other medical report suggesting that she had a severe mental impairment. *See* 20 C.F.R. § 404.1521(a) (stating that an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities).

Second, as ALJ Schneider also noted, by the time plaintiff's current application reached the hearing stage she was no longer taking anti-depressant medication and reported no need for the same. ALJ Schneider made this observation regarding the 1998 hearing before ALJ Quayle, but this was appropriate because plaintiff's insured status ended on June 30, 1998. Therefore, her condition in 1998 was at issue. It is also worth noting that plaintiff testified at the hearing before ALJ Schneider in October 2000 that her psychological problems had cleared up. (Tr. at 422.) [13]

---

13. I further note that the VE independently considered Dr. Lenard's report, stating: "When we incorporate those things, she's be- low average in the general population, but still well within the abilities to do the jobs that I stated." (Tr. at 434.)

However, even though I cannot find reversible error in the ALJ's *de novo* review of plaintiff's mental impairment, there remains the issue of res judicata. In adjudicating plaintiff's first application in 1996, ALJ Pleuss found that plaintiff did have a severe mental impairment. ALJ Schneider disagreed with ALJ Pleuss on this issue (Tr. at 24), yet he later "affirmed" ALJ Pleuss's decision (Tr. at 28 # 1). He did so without considering whether and how the principle of res judicata applied.[14]

## E. Res Judicata

The doctrine of res judicata applies in social security proceedings. *See, e.g., Rucker v. Chater*, 92 F.3d 492, 494 (7th Cir.1996). Thus, in certain circumstances, findings made by an ALJ following a hearing are binding on the parties in any subsequent proceedings. *Id.* (citing 42 U.S.C. § 405(h)); *see also* AR 93–3(6). The Commissioner, as well as the claimant, may be bound by prior adjudications. *Rucker*, 92 F.3d at 494 (citing *Dennard v. Sec'y of Health and Human Servs.*, 907 F.2d 598, 600 (6th Cir.1990); *Lively v. Sec'y of Health and Human Servs.*, 820 F.2d 1391, 1392 (4th Cir.1987); *Gavin v. Heckler*, 811 F.2d 1195, 1200 (8th Cir. 1987)).

However, the Seventh Circuit has held that when the claimant's applications are separated in time, such that a different conclusion as to the claimant's condition could plausibly be reached, res judicata does not apply. *Id.* at 495. For instance, in *Rucker*, the court affirmed an ALJ's conclusion that the claimant could return to her past work even though a previous decision held that she could not. The court stated:

In the instant case, the second ALJ considered Rucker's disability status only for the period after March 19, 1990, the date the Commissioner denied her first application. The hearing before the second ALJ, therefore, was not a "re-evaluation" of the evidence, but rather an independent consideration of her eligibility at the time of her second application. The time period was different, and a different outcome is not necessarily inconsistent. *See Reynolds v. Bowen*, 844 F.2d 451, 454 (7th Cir.1988).

*Id.*

In the present case, conversely, ALJ Schneider did "re-evaluate" the evidence that was before ALJ Pleuss, reaching a different conclusion. He also considered new evidence that was not before ALJ Pleuss. However, it is clear that ALJ Schneider thought it appropriate to look at the case "from scratch." (Tr. at 411.) The Appeals Council directed the ALJ to consider res judicata and "include decisional language explaining which findings from the prior decision remain binding and which do not." (Tr. at 21.) He failed to do so. Nor did he explain how any possible change in plaintiff's condition from the time of the first decision to the end of plaintiff's insured status impacted upon his decision. Therefore, the ALJ must address this issue on remand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is **ADOPTED** as stated herein, the Commissioner's decision is REVERSED, and this

14. In any event, the ALJ must on remand "consider the combined effect of all of [plaintiff's] ailments, regardless of whether 'any such impairment, if considered separately, would be of sufficient severity.'" *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir.2000) (quoting 20 C.F.R. § 404.1523).

matter is **REMANDED** for further proceedings consistent with this order.